OBERER CONSTRUCTION Co., PLAINTIFF, *v.* PARK PLAZA, INC., ET, DEFENDANTS.

Common Pleas Court, Montgomery County.

No. 117476. Decided September 18, 1961.

*Messrs. Lair, Herkins, Lair & Wiseman, Mr. Joseph P. Lair,* of counsel, and *Messrs. Landis, Ferguson, Bieser & Greer, Mr. Rowan A. Greer, Jr.,* of counsel, for plaintiff.

*Messrs. Young, Pryor, Strickland & Falke, Mr. Richard E. Pryor* and *Mr. Lee C. Falke,* of counsel, for Park Plaza, Inc.

(SANDERS, P. J., of Union County, PORTER, J., of Miami County, and BAYNES, J., of Madison County, sitting in Montgomery County, by assignment of the Chief Justice of the Ohio Supreme Court.)

BAYNES, J. This case was submitted to a three-judge trial court upon the waiving of a jury and request for trial before a panel; (Section 2315.21, Revised Code.)

Plaintiff is engaged primarily as an earth-moving contractor. Its first cause of action makes two claims. It seeks a recovery of the reasonable value of the benefit to the defendant's premises performed under a contract between the parties and for services performed under an alleged supplemental agreement. The total of the claims is $17,210.75 with interest from February 3, 1960. The second cause of action seeks foreclosure of an alleged mechanic's lien for total claim amount. The third cause of action seeks damages of $25,000 for breach of the original and supplemental contracts.

The answer of defendant Park Plaza, Inc., admits status and capacity of the parties and that the Casualty Company defendant has executed a bond to secure any judgment recovered by plaintiff from defendant in substitution of any rights of plaintiff under the alleged mechanic's lien.

Park Plaza, Inc., filed a cross-petition. The first cause of action seeks damages of $66,500 for plaintiff's alleged breach of contract being the difference between plaintiff's bid for the work and defendants' cost of completing the work. An additional claim for alleged loss of rentals of $15,305 is made. The second cause of action seeks damages of $8,000 for the alleged "improper and malicious mechanic's lien filed."

The answer of plaintiff to the cross-petition is in form of a general denial. Prior to resting its case, plaintiff moved to dismiss its third cause of action.

The testimony and argument consumed thirteen (13) trial days. The record discloses much conflict and contradiction and little agreement. The questions necessary to be determined are these:

(1) Was there a written contract between the parties dated January 9, 1960?

(2) Was there an enforcible oral supplemental agreement subsequently entered into by the parties?

(3) Was there a breach of either or both of the claimed written contract or claimed supplemental agreement?

(a) Did plaintiff breach, or

(b) Did defendant breach? And if it did,

(4) Under either or both the claimed contract or claimed oral agreement, what work or services did plaintiff perform?

(5) (a) Under the claimed contract:

A. The reasonable value of his performance;

B. The benefit of the improvements, if any, which defendant derived from the work performed by plaintiff.

(b) Under the claimed oral agreement:

A. The contract price value.

It is not in controversy that plaintiff's president, after discussion of terms and contents, drafted and submitted on January 9, 1960, in Dayton, Ohio, a letter of offer. This letter of offer was signed that day and place by defendant's authorized representative, one Howard Silverberg. This representative had also represented defendant in its lease and other property acquisitions negotiations antedating the January 9, 1960, offer and acceptance. The president and vice president of plaintiff as part owners of the fee of the leasehold were familiar with these negotiations. In addition plaintiff had submitted a bid for work on the same area to Howard Silverberg on October 1, 1959, which had not been accepted.

It might have been that neither the controversies subsequent to January 9, 1960, and this action would have remained unresolved except for the fact that Howard Silverberg was killed, together with all other occupants of an airplane, in a crash on January 18, 1960. Thereafter, according to his religious custom, Akiba Zilberberg, brother of Howard Silverburg and president of defendant, was in mourning until January 29, 1960. The death of Howard Silverberg handicapped defendant's evidence in the case as to the surrounding circumstances and meaning of various terms in the offer and acceptance and otherwise.

The offer and acceptance provided (plaintiff's exhibit 1):

"1) All machine excavation necessary to prepare proposed grades as shown on the Ralph L. Woolpert drawing issued September 10, 1959. This will include site excavation; building excavation and footer excavation. Fills in the building area will be made to 95% compaction.

"And qualified tests will be made and reports given to the Owner verifying the compaction. Construction operations will be conducted in such a way as to maintain the Bingo Operation.

"We will furnish the completed building site (with 3″ gravel on the suface) within 30 days from the starting date providing weather will allow. We understand the Owner will furnish the necessary stakes for excavation. Providing the Owner has the stakes in place we will start the excavation Monday, January 11th.

"2) . . . . . . .

". . .

"We understand time is of the essence and we will prosecute the above described work with all the diligence which weather conditions will allow."

One Donovan was in charge of the work for defendant. He had been in Dayton since January 3, 1960, and had been hired by Howard Silverberg. Several controversies arose between plaintiff and Donovan. The primary one and the one which, as we find, resulted in a breach by the defendant of the accepted offer was Donovan's insistence that plaintiff proceed on establishing building grades under the *Orgler* plan rather than the *Woolpert* plan stated in the accepted offer.

The *Woolpert* plan essentially contemplated a balanced amount of excavation and fill to be obtained from the 43-acre Shopping Center site. It is not controverted that this contemplated the transferral of about 190,000 cubic yards. The *Orgler* plan was to require between 35 and 40,000 more cubic yards of excavation. There was testimony that Donovan told plaintiff that he wanted the building site graded to the *Orgler* plan elevations and it didn't make any difference as to the grade elevation of the parking areas. There is creditable testimony that this was not possible without the redrafting of an entirely new grade plan taking into account an underlying rock formation and sub surface drainage system.

The accepted law is that:

"An owner commits a breach of a construction contract by changing plans and specifications otherwise than the contract permits and ordering substituted performance. * * * A change that is wrongfully required may involve so great delay or expense as to amount to a total breach as a practical repudiation of the construction contract. An assent by the contractor and proceeding with the work as demanded, without reservation of rights, will operate as a variation of the original

contract leaving no claim for damages." Corbin on Contracts v. 4, 815, Sec. 947; See also 11 Ohio Jurisprudence (2d), 510, 511, Secs. 250, 252; CJS Contracts v. 17, 969, Sec. 468; Restatement of Contract, 468, Sec. 315.

In our view this demand of a substantial excess of work from plaintiff by defendant went to the essence of the contract. On the other hand, a demand that he change from one plan to another as might conveniently suit plaintiff or defendant left the work to be done subject to no plan at all. This had the potentiality of an hour-to-hour day-to-day disagreement in a relationship already burdened with ambiguitites and misunderstandings.

Plaintiff and defendant were in disagreement as to who should bear the expense of an unsuitable soil compaction condition discovered in the building site area. This required the removal and wasting of a substantial quantity of earth and replacing it with stable material so as to get 95 per cent compaction on the fill on top of the affected area.

Also, the records of the weather bureau disclose between January 11 and February 3, inclusive, a period of 24 days, there was in the area 1.66 inches of precipitation. The average temperature for 12 days was below 32 degrees (Fahrenheit), 8 days between 32 and 42 degrees, and 4 days above 42 degrees. At some time or other during 18 of these 24 days the temperature was below freezing.

Due to the weather circumstances compacting the excavated material was extremely difficult to impossible. It was discussed between Donovan, plaintiff and others that compaction could be obtained by using a gravel fill to be obtained from an area adjacent to the Shopping Center site. Donovan authorized a charge of 50 cents per cubic yard for the hauling of this gravel, and Akiba Zilberberg confirmed it. From which we find a valid supplementary oral agreement to that extent. We do not, however, find any other agreement as to matters collateral to and in connection with hauling this gravel as was in dispute between the parties as there was no meeting of the minds.

As a result of these and other disputes at Donovan's request plaintiff submitted on February 2, 1960, a supplemental contract in writing which was to cover all the additional charges

for the excavation and fill based on the *Orgler* plan. This called for the additional sum of $88,000 over and above the $80,500 amount set out in the original offer and acceptance.

This was forwarded to defendant's office in Pittsburgh, Pennsylvania. There is conflicting testimony as to whether plaintiff threatened to quit the job or would have to hold up going forward on the work pending a signature of the tendered supplemental contract or some negotiated modification of it, but we are not compelled to say, in view of our finding that defendant breached the original offer and acceptance. This latter offer was never accepted by defendant.

On February 3, 1960, Donovan had a Norfolk, Virginia, excavating contractor looking the job over, and this contractor subsequently entered into an agreement with defendant based on the *Orgler* plan. Its terms were so different and the testimony with respect to the value of performance under this contract as compared to plaintiff's contract insufficiently clear that even though we were constrained to hold, which we are not, that plaintiff breached, we would be unable to conclude whether defendant benefited or was damaged as a result of its disagreement with plaintiff.

Coming now to the damage award to which plaintiff is entitled. This is not a simple and easy matter, even though the defendant is, as we find, the wrongdoer.

"In any case where the alternative remedy of restitution of value received is available to plaintiff, the proper measure of recovery is the reasonable value of the part performance rendered by him to defendant, uncontrolled by the contract price or rate or by any other terms of the express contract." Corbin on Contracts v. 5, 492, Sec. 1112; 47 Ohio Jurisprudence (2d), 559, Sec. 41; 20 O. S. L. J., 203-207, 264-283.

It is well substantiated in this case that in some particulars, and as it is reasonable to assume under the circumstances, some of the work such as conditions of stumps, ridges and piles of stripped material were not left in a satisfactory condition. So that value per acre for stripping and clearing would necessarily be subject of some adjustment.

The $17,210.75 claim of value of plaintiff was based on plaintiff's daily record of laborer, operator, supervisor and

machine hours at a claimed rate. There was an attempt by plaintiff to reconcile the difference between those rates and rates submitted on an additional work proposal on January 29, 1960, to defendant. Donovan testified, with little if any contradiction on cross-examination, that applying the total of hours respectively shown on these work records at rates used on the claim statement that this totalled $15,337.25 rather than $17,-210.75. That applying the contract rates submitted by plaintiff on January 29 to the hours shown on the work records, the total would be $12,249.50.

This is further complicated by the fact that there was a dispute as to who had the liability to remove the unsuitable material at the building site and the replacing it with material which would compact to 95 per cent. Whichever of the above. figures are valid, the removal of this material is included as well as the hauling of bank run gravel to replace the removed material. It also included time for the building of a haul road from the adjacent site.

There are no facts in the record of this case which would warrant a finding that plaintiff is entitled to compensation for the removal of the unsuitable material or "undercutting," the term used in the trade.

"Unforeseen difficulties in doing the work contracted for requiring additional work do not entitle the contractor to extra compensation." 11 Ohio Jurisprudence (2d), 521, Sec. 264; ibid Sec. 254; *Ashley* v. *Henahan*, 56 Ohio St., 559, 47 N. E., 573; *Jewett* v. *Sayre*, 95 Ohio St., 85, 95, 109 N. E., 636; see also Corbin on Contracts v. 1, 597, Sec. 184.

Defendant in this case did not promise any additional compensation therefor and did in fact through its agent Donovan insist that plaintiff go forward with its contract in that regard. However, there was an insistence that plaintiff cut to the *Orgler* plan, which at the building area was about two feet lower in elevation than that called for by the *Woolpert* plan. This would tend, probably, to add an additional burden on plaintiff. Whether this is so in fact is not altogether clear from the evidence as to the "undercutting" actually performed.

The custom testimony, contradictory and unsatisfactory as it was, cannot overcome the rule of law in Ohio as stated in the *Ashley* and *Jewett* cases. Sub-surface conditions are a

matter to be taken into account in a bid where the contractor has at least, or ought to have, as much or more knowledge about them than the owner.

As to plaintiff's recovery, we find that the *gross* reasonable value of the performance was $12,249.50, which includes the cost of the "undercutting" to plaintiff of $2,442. There should also be deducted from this $403 soil testing expense, which by the offer and acceptance was an obligation of plaintiff but was in fact paid by defendant. In order to reach the *net* reasonable value of the performance, there should be deducted a sum which we ascertain to be $404.50 for the additional expense incurred by defendant in the completion of the work which plaintiff contracted to do and which it was obligated to bear if it had completed the job, and including a deduction for the haul road work. As we have indicated in view of the ambiguities contained in the contract drawn by plaintiff some of its difficulty is of its own making, and the offer and acceptance is to be construed most strongly against it; 11 Ohio Jurisprudence (2d), 391, Sec. 147; Corbin on Contracts v. 3, 262, Sec. 559.

We therefore find that the *net* reasonable value of plaintiff's performance is $9,000, for which plaintiff is entitled to judgment with interest from February 4, 1960. We also find that $9,000 to be the benefit which defendant derived from plaintiff's performance. In either event this necessarily includes that due plaintiff under the written offer and acceptance and the 50 cents per cubic yard for gravel under the oral contract.

We have carefully reviewed the evidence from our voluminous notes and the exhibits admitted into evidence and have carefully weighed the credibility of the several witnesses and are convinced that our judgment renders substantial justice between the parties.

Judgment is entered accordingly.

SANDERS, P. J., and PORTER, J., concur.